# Limitations on Presidential Power to Create a New Executive Branch Entity to Receive and Administer Funds Under Foreign Aid Legislation

The President lacks constitutional and statutory authority to create a new entity within the Executive Branch to receive and administer funds appropriated under the International Security and Development Act of 1985 (ISDA).

The Appointments Clause in the Constitution requires that "offices" of the United States be established "by Law." Any agency created to receive and administer funds appropriated under the ISDA would have to be headed by an officer of the United States, who would occupy an "office" of the United States. Such new offices of the United States must be created or authorized by Congress through enactment of legislation.

Presidential creation of the United States Sinai Support Mission under Executive Order No. 11896 does not provide persuasive precedent for Presidential creation of a new agency to administer funds under the ISDA. In that situation, the President was able to rely upon authorization provided by § 631 of the Foreign Assistance Act of 1961, which gave the President power to establish "missions" abroad.

August 23, 1985

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

As you know, § 722(g) of the recently enacted International Security and Development Act of 1985 (ISDA) authorizes $27 million to be appropriated "for humanitarian assistance to the Nicaraguan democratic resistance." That section provides, in part:

> Effective upon the date of enactment of this Act, there are authorized to be appropriated $27,000,000 for humanitarian assistance to the Nicaraguan democratic resistance. Such assistance shall be provided to such department or agency of the United States as the President shall designate, except the Central Intelligence Agency or the Department of Defense.

131 Cong. Rec. 21248 (1985). The President has not yet designated an agency or department to receive the assistance authorized by the ISDA. Certainly, this legislation authorizes the President to designate an existing agency or department of the United States, such as the State Department, the Agency for International Development, or the Executive Office of the President, to receive

and thereupon to disburse the assistance. This designation could be accomplished in several ways, from a formal executive order to an oral directive from the President.

A more difficult question is whether the President could create a new entity within the Executive Branch, independent of existing agencies and departments, to receive the assistance and administer the program. We conclude that in these circumstances the President lacks constitutional and statutory authority to do so.

Our conclusion is based on the language in the Appointments Clause of the Constitution, which appears to vest responsibility for creating offices of the United States in Congress:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, *and all other Officers of the United States*, whose Appointments are not herein otherwise provided for, and *which shall be established by Law* . . . .

U.S. Const. art. II, § 2, cl. 2 (emphasis added). To our knowledge the question has never been definitively adjudicated, but the language of the Appointments Clause and the historic practice of the Executive and Legislative Branches suggests strongly that offices of the United States must be created by Congress. Professor Corwin has noted, for example:

> The Constitution . . . by the "necessary and proper" clause assigns the power to *create* offices to Congress, while it deals with the *appointing power* in the . . . words of Article II, section 2, paragraph 2 . . . . An appointment is, therefore, ordinarily to an *existing* office, and one which owes its existence to an act of Congress.

Corwin, *The President: Offices and Powers* 83 (1948). *See also The Constitution of the United States of America, Analysis and Interpretation*, 92d Cong., 2d Sess. 523 (1973):

> That the Constitution distinguishes between the creation of an office and appointment thereto for the generality of national offices has never been questioned. The former is *by law* and takes place by virtue of Congress's power to pass all laws necessary and proper for carrying into execution the powers which the Constitution confers upon the government of the United States and its departments and officers.

This dichotomy between creation of the office and appointment to the office is consistent with the historic view of the Executive and Legislative Branches as respects the proper division of constitutional responsibility. Congress has provided by statute for the establishment of Executive Branch agencies and

77

particular positions within those agencies, and the President or heads of those agencies select individuals to fill those positions. Except as specifically provided by law, the President assigns responsibilities to those agencies and positions to carry out the laws. This understanding has also generally been reflected in the Executive Branch's acquiescence in the need for reorganization legislation in order to restructure or consolidate agencies within the Executive Branch.

We believe that any agency created by the President to implement § 722(g) would, of necessity, have to be directed by an officer of the United States within the meaning of *Buckley* v. *Valeo*, 424 U.S. 1, 126 (1976) (per curiam), who would occupy an "office" of the United States. Because that office would be created independent of any other agencies or departments of the Executive Branch, that office would clearly be a new office. Therefore we do not believe that, absent statutory authorization, the President would have authority to create such an office.[1]

We have not found adequate statutory authority either in the ISDA or in the Foreign Assistance Act of 1961, 22 U.S.C. §§ 2151–2429a, to allow the President to create a new office to implement the humanitarian assistance program. Under the ISDA, the President "shall designate" "such agency or department of the United States" as he deems appropriate to administer the program. On its face, that language appears to contemplate that the assistance will go to an existing agency or department. At least in the absence of some legislative history suggesting that Congress understood that the program would be administered through a new agency (which we have not found), we cannot read that language affirmatively to authorize the President to create an entity outside of existing agencies or departments. In similar language, the Foreign Assistance Act provides authority to the President to delegate functions "to such agency or officer of the United States Government as he shall direct." 22 U.S.C. § 2381. Again, there is nothing in that language to suggest that Congress intended or contemplated that the President could create a wholly new administrative entity, outside structures within the Executive Branch, to fulfill those statutory responsibilities. Therefore, we do not believe that the President could create a new agency outside of existing Executive Branch agencies and departments and designate that agency to receive the appropriated funds and implement the program of humanitarian assistance.

---

[1] We do not mean to suggest that the President does not have some residuum of inherent constitutional authority to create offices or agencies, based on the direction in Article II, § 1, that the "executive Power" shall be vested in the President, and the mandate in Article II, § 3 that he "take Care that the Laws be faithfully executed." Such authority seems to be contemplated by 31 U.S.C. § 1347, which provides that "[a]n agency in existence for more than one year may not use amounts otherwise available for obligation to pay its expenses without a specific appropriation or specific authorization by law," and specifically refers to agencies "established by executive order." Section 1347 obviously cannot be read as an affirmative grant of authority to the President to create agencies by executive order, and we therefore do not believe that we can rely on that language here to overcome the express language of the Appointments Clause. There may be cases, however — in a national emergency, for example — in which we would conclude that the President may, in effect, create an office in order to carry out constitutional responsibilities that otherwise could not be fulfilled.

We are aware of one entity that has been advanced as precedent for Presidential creation of such an agency. In Executive Order No. 11896 (Jan. 13, 1976), *reprinted in* 41 Fed. Reg. 2067 (1976), the President created the United States Sinai Support Mission to assist in the implementation of the "United States Proposal for the Early Warning System in Sinai." The letter prepared by the Office of Management and Budget to the Attorney General supporting the executive order recited that the mission was intended to be a "separate, independent mission, outside of the Department of State."

We do not believe that Executive Order No. 11896 is a clear precedent for creation of an independent agency to implement the Nicaraguan humanitarian aid program. As the OMB letter notes, the President was able in that instance to rely on the specific congressional authorization provided by § 631 of the Foreign Assistance Act of 1961, 22 U.S.C. § 2391, which gives the President the power to establish "missions" abroad. This specific authority would not appear to be available here. Second, the circumstances surrounding the adoption of the Joint Resolution of October 13, 1975, Pub. L. No. 94–110, 89 Stat. 572 (1975), by which Congress authorized the establishment of a monitoring force to implement the "United States Proposal for the Early Warning System in Sinai," provide some evidence that Congress contemplated the creation of a new agency to fulfill the objective of the Resolution. Congress was specifically aware that a force of two hundred civilians was needed to monitor the system. As there were few precedents for such a civilian monitoring force and no agency with obvious expertise in providing such services, it is not unreasonable to infer that Congress contemplated that the President, pursuant to his broad authorization to implement the monitoring proposal, might create a new agency to serve as the monitoring force.

As set forth above, § 722(g) of the ISDA, however, does not provide similar support for an inference that Congress intended to empower the President to create a new agency. Furthermore, the Sinai Support Mission received its allocation of funds from the Secretary of State rather than the President, *see* Exec. Order No. 11896, § 5, and the Secretary of State was ordered to exercise "continuous supervision and general direction" of the activities of the Mission, *id.* at § 1(b). The vesting of the combined power to supervise and allocate funds in the Secretary raises a serious question as to the formal independence of the Mission and suggests that the Mission should, as a technical matter, probably be considered to have been within the Department of State. Thus, we do not view the creation of the Sinai Mission as particularly useful precedent here.

In conclusion, we believe that the assistance authorized for Nicaraguan humanitarian relief must be channeled through an existing department or agency of the United States. We believe that creation of a new agency to administer the program outside of the confines of existing agencies and departments would raise substantial constitutional questions, and we therefore could not approve a Presidential directive purporting to establish such an agency. The question of which agency or department should be designated to provide the assistance authorized by § 722(g) is one of policy; aside from the prohibition

against use of the Central Intelligence Agency or the Department of Defense, the ISDA gives no guidance and places no limitations on the choice of agency or department.

RALPH W. TARR
*Acting Assistant Attorney General*
*Office of Legal Counsel*